**MAIN STREET FEEDS, INC.,**
Plaintiff–Respondent,

v.

**Viga HALL and Jane Hall, Defendants–Appellants.**

No. 21937.

Missouri Court of Appeals,
Southern District,
Division Two.

Aug. 25, 1998.

---

Carr L. Woods, Monett, Craig A. Smith, Daniel, Clampett, Powell & Cunningham, Springfield, for Appellants.

John Cowherd, Mt. Vernon, for Respondent.

PARRISH, Presiding Judge.

Viga Hall and Jane Hall (defendants) appeal a judgment quieting title to a 70–foot strip of land and enjoining them from interfering with Main Street Feeds, Inc.'s (plaintiff) use of the property. The strip of land was part of two vacated city streets. The judgment is affirmed in part, reversed in part and remanded.[1]

Plaintiff owns Lot 12, Plymouth Addition to Monett, Missouri.[2] Defendants own Lot 13 in the same subdivision. The lots, as originally platted, are separated by a 70–foot strip of land that had been part of two streets. Lot 12 is on the eastern side of the 70–foot strip. Lot 13 is on the western side. Lots 12 and 13 and the 70–foot strip that runs between them are bordered on the south by a railroad right-of-way and on the north by Main Street.

In 1905 Monett's Market Street ran in a north-south direction. Its boundaries included Lot 12 and land that adjoined Lot 12 on the west side. By city ordinance dated March 28, 1905, the city of Monett vacated the portion of Market Street that crossed Lot 12 and an additional 40 feet that joined Lot 12 on the west. The area that was vacated was "off the east side of that part of Market Street, lying between Main Street" and the railroad right-of-way. The area was vacated to establish a mill site.

The parties concede that a north-south thoroughfare continued to exist over part of the area now in dispute after the 1905 vacation of part of Market Street. It became Euclid Avenue. In 1947 the part of Euclid Avenue that ran between Lots 12 and 13 was vacated.

Viga Hall's parents, V.B. Hall and Audrey Hall, purchased Lot 12 in 1943. In 1946, V.B. Hall purchased Lot 13. Viga Hall testified that the vacated property was a "forest" when his parents purchased Lots 12 and 13. He told the trial court that a crew of people cut down trees and shrubs and leveled the land. His father paved the old street after it had been cleared. A loading dock was constructed at the south side of the vacated property.

Viga Hall's parents sold Lot 12 to Katy Mills in 1949. The land was later sold to

---

1. The trial court denominated the judgment that is the subject of this appeal "Amended Judgment." A prior appeal was dismissed because the purported "Judgment" the trial court attempted to enter was not final; it did not adjudicate title to all of the property involved in the dispute. *See Main Street Feeds, Inc. v. Hall,* 944 S.W.2d 328 (Mo.App.1997).

2. The trial court found that Lot 12 was 25 feet wide. It was one of six lots in Block 1 of the subdivision. A plat admitted in evidence shows the width of the entire block (across its northern boundary) to be 150 feet. Plaintiff's business premises include all six lots (Lots 7, 8, 9, 10, 11 and 12). The lots are numbered from east to west. Lot 12 is the western-most lot. The parties refer only to Lot 12 for convenience since its western boundary adjoins the disputed areas.

Harry E. Surface Co.; then in 1951 to Norris Grain. Norris Grain sold Lot 12 to M.F.A. Cooperative Association of Monett, Missouri, (M.F.A.) in 1972. Double M Farmers Co-op (that had formerly been M.F.A.) sold it to plaintiff in 1989. Plaintiff has operated a feed store on Lot 12 since 1989.

V.B. Hall died in 1974. After his death Lot 13 became the property of his widow, Audrey Hall. In 1976 she conveyed Lot 13 to Viga E. Hall. In 1994 Viga Hall decided to open an antique mall on his property and to use the vacated street area as a parking lot for the mall. Mr. Hall placed concrete bumpers along the center of the strip of land and dug holes for concrete posts. He parked his vehicle there.

Plaintiff filed this action June 24, 1995. It filed an amended petition October 17, 1995. Plaintiff sought to enjoin defendants from constructing any structure on the 70–foot strip of land between Lots 12 and 13 that would block, restrict or impede access to its business on Lot 12 (Count I), and a declaration that plaintiff was owner of the eastern one-half of the 70–foot strip or had an easement over that property (Count II).

Defendants filed a counterclaim to quiet title to the 70–foot strip of land and to enjoin plaintiff from claiming interest in the property (counterclaim Count I). Defendants sought to eject plaintiff from the property (counterclaim Count II), damages for trespass (counterclaim Count III) and to enjoin plaintiff from placing structures on the property, using any part of the concrete dock on the premises, storing merchandise on the property or otherwise using it (counterclaim Count IV).

The trial court entered judgment:

1. declaring title to the east 40 feet of the disputed property vested in plaintiff and title to the west 30 feet of the property vested in defendants (Count I of the petition and counterclaim Count I);

2. declaring that the respective parties had reciprocal easements over the portions of the disputed property the trial court had decreed was owned by the other; enjoining defendants from blocking and impeding access to plaintiff's property, including constructing any fence or barrier on the property; ordering defendants to "repair" the premises on which holes had been dug (Count II of the petition and counterclaim Count I);

3. enjoining plaintiff from impeding access to defendants' property, including constructing any fence or barrier on the vacated property (counterclaim count IV);

4. denying defendants' ejectment action and trespass action (counterclaim Counts II and III).

This case was tried without a jury. Appellate review is undertaken pursuant to Rule 73.01(c). The judgment will be affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence or the judgment erroneously declares or applies the law. *Enderle v. Robert,* 863 S.W.2d 692, 693 (Mo.App.1993).

Defendants present six points on appeal. Point I is directed to the part of the judgment declaring that title to the east 40 feet of the disputed property is vested in plaintiff. Points II, III and IV are directed to the part of the judgment holding that plaintiff has an easement over the west 30 feet of the property. Point V contends the trial court erred by enjoining defendants from erecting a fence or barrier on the property and restricting access to plaintiff's business. Point VI is directed to the trial court's denial of defendants' claim for ejectment.

*The East 40 Feet of the Disputed Property*

Point I contends the trial court erred in declaring plaintiff owner of the east 40 feet of the vacated property because defendants' "predecessor in interest" owned Lots 12 and 13 after the streets were vacated and later conveyed Lot 12 without reference to any part of the vacated streets and remained in possession of the area where the streets had run. Plaintiff's response is that the conveyance of Lot 12 by defendants' predecessors in interest included the conveyance of the 40 feet immediately to the east of Lot 12; that a conveyance of property that adjoins a vacated street includes the area where the street

previously ran even though the adjoining area was not identified in the conveyance.

The trial court found that on March 28, 1905, the city of Monett vacated the east 40 feet of Market Street (that adjoined Lot 12). The part of Market Street that adjoined Lot 13 remained. The trial court concluded that the language of the 1905 ordinance clearly evidenced the intent to attach the vacated property to Lot 12 in order to establish a mill site.[3] It found that since not all of Market Street was vacated (only that part that adjoined Lot 12), the vacated property attached to Lot 12.[4]

*Prewitt v. Whittaker,* 432 S.W.2d 240 (Mo. 1968), recites applicable Missouri law.

This state has long followed the general rule that a conveyance of platted lots or blocks adjoining an *existing* street, without mentioning the street in the deed, carries to the grantee the fee simple title to the center of the street (or to the far side if the original grantor contributed all of the street to public use). *Snoddy v. Bolen,* 122 Mo. 479, 24 S.W. 142, 25 S.W. 932, 934, 24 L.R.A. 507; *Thomas v. Hunt,* 134 Mo. 392, 35 S.W. 581, 583, 32 L.R.A. 857 (" 'The presumption is that the grantor did not intend to withhold any interest in the street or highway.' 'The presumption may be overcome,' says Judge Black, 'but it must be overcome by something stated in the deed which shows distinctly an intention to withhold an interest in the street.' *Snoddy v. Bolen, supra.*").

. . .

Initially the same rule of construction or presumption of grant of the fee simple title in an existing street should apply to the grant of lands adjoining a street which has been vacated, when the street has not been mentioned in the deed. This accords with the view of most of the later cases dealing with the point as collected in 49 A.L.R.2d

1002, § 8, and would prevent detached (and unused) strips and gores of land. But there is an obvious practical difference of reason for the method of rebuttal of the rule of construction or presumption as to an existing street and one which has been vacated. In an existing street the owner has no right to use it as to interfere with the rights of the public. There is a mere possibility that the owner of land adjoining the existing street will succeed to its full unencumbered use by reason of a future vacation. It has little value to him. Thus the rule and policy in the *Snoddy* case and the *American Steel & Wire [Co. of New Jersey v. City of St. Louis,* 354 Mo. 692, 190 S.W.2d 919 (1945) ] case become fully applicable: The presumption may be overcome only by something stated in the deed, and the application of this rule would settle the title for intervening years between establishment of a street and vacation thereof. In the case of a conveyance after a street has been vacated, the adjoining owner has full title (under the statute or ordinance) unencumbered by the public use. Since it *may* now be valuable to the owner after vacation, that other reason for the general rule in the *Snoddy* case might not apply. The owner of the vacated street should not be bound by the hard and fast rule that the rule of construction or presumption may be rebutted only by something stated in the deed, as by a reservation (which would be better conveyancing practice). Rather, his intention to withhold the vacated area should be permitted to be shown by the surrounding facts and circumstances as will clearly and unequivocally show such intention.

*Id.* at 243–44 [emphasis in original].

The facts and circumstances in *Prewitt* showed that the grantors of land that abutted a previously vacated street had no intention of conveying the portion of the vacated

---

3. Neither the 1905 city ordinance that vacated part of Market Street nor the 1947 city ordinance that vacated Euclid Avenue were introduced in evidence. The record reflects they were marked and used as evidence. When this occurs, the exhibit is in evidence as if it had been formally admitted. *See Weule v. Cigna Property and Cas. Co.,* 877 S.W.2d 202, 204 (Mo.App.1994).

4. Defendants do not question the trial court's finding that the 40 feet of Market Street reverted to the owner of Lot 12 in 1905 when part of the street was vacated.

street that adjoined the property. It explained that the grantors still owned land on the opposite side of the street "and, most importantly, ... remained in possession of the street, using about the south half of it as a garden, keeping a cow for a time in the barn on its northern part, and mowing the area from 1952 to 1963." *Id.* at 244.

The other parties made no claim to or use of the disputed area during the time the grantors occupied it. The adverse parties' tax receipts had not reflected assessment of taxes for the vacated street area during the "early years" after they acquired their property and expressly excluded the area "in later years." *Id. Prewitt* held that the grantors retained ownership of the vacated street that adjoined the property they conveyed.

*Prewitt* established the rule "that where land adjoining a previously vacated area ... is conveyed without mentioning the area, half (or all as the facts show [in *Prewitt*]) of the vacated area is presumed to be included in the grant, *which presumption is subject to being rebutted by surrounding facts and circumstances clearly and convincingly showing an intention to the contrary.*" *Id.* at 245 [emphasis added].

Defendants contend the facts in this case are analogous to those in *Prewitt;* that the evidence clearly and convincingly shows that V.B. Hall and Audrey Hall (defendants' predecessors in title) intended to retain the area between Lots 12 and 13 when they conveyed Lot 12 to Katy Mills (plaintiff's predecessor in title). Defendants argue the trial court erred in holding that the disputed area was conveyed to Katy Mills as part of Lot 12.

The issue in Point I is whether the trial court's finding that the eastern 40 feet of the strip of land in question was conveyed as part of Lot 12 was against the weight of the evidence. Defendants assert that in 1943, when V.B. Hall acquired Lot 12, he acquired title to the part of Market Street that had been vacated in 1905. He acquired Lot 13 in 1946. He owned the land on both sides of the part of Euclid Avenue when it was vacated in 1947. The part of Euclid Avenue that was vacated became his property.

V.B. Hall tore down a building on Lot 12. He constructed and used a dock at the south side of the vacated street area. After Euclid Avenue was vacated, he cleared the "forest" that had existed on the old street area. He parked vehicles on the vacated street area. Tenants of Mr. Hall who operated businesses on Lot 13 parked vehicles there.

According to the testimony of Viga Hall, the building that was torn down on Lot 12 was a three or four-story building. It was where plaintiff now has a warehouse. Viga Hall believed the building was torn down about 1945.

V.B. Hall operated a lumber yard and concrete block factory on the mill property site. There was a grocery business on Lot 13. The dock at the south end of the vacated street area was built to accommodate the grocery business. It was built after the building on Lot 12, the mill property, had been torn down. The concrete block factory on Lot 12 did not require a building.

V.B. Hall constructed another building on Lot 12. It is now part of plaintiff's business premises. Viga Hall testified that trees and shrubs were cut and the land was leveled "and cut into the side of the hill and got ready to build the building that's there now." V.B. Hall later moved his business into the premises on Lot 13 that the grocery business had occupied.

Defendants argue that the foregoing supports their claim that V.B. Hall intended to keep all of the vacated street area when Lot 12 was conveyed to Katy Mills. The trial court heard the evidence upon which defendants rely. It also heard testimony concerning the use of the vacated street area after Lot 12 was sold to Katy Mills. The area along the west side of the building on Lot 12 was used to load feed onto trucks, particularly in the early years when Norris Grain's business was there. There was a west door that was used to load merchandise and supplies that customers purchased and receive deliveries.

V.B. Hall operated V.B. Hall Wholesale Co. If there were problems with his company's trucks being in the way of the door on the west side of the mill, his personnel would

be contacted. They would move the trucks. Sam Sagehorn, manager for Norris Grain from 1951 to 1972, explained, "Well, we just had an agreement that they never blocked it, . . . ." He was asked, "So if they needed to move their trucks, they would?" He answered, "Sure." Mr. Sagehorn told the court that Norris Grain reciprocated. "If they had, say, a trailer come in and we had something out there that was temporarily blocking it, why, we'd, of course, work back and forth."

Victor Arnaud, a former board member of M.F.A., testified that he served on M.F.A.'s board from 1972 until 1989. He was familiar, as a board member and as a customer of M.F.A., with the vacated street area. M.F.A. (and later Double M Farmers Co-op) continuously used the vacated street to load and unload feed from the door on the west side of the building. Mr. Arnaud testified that the co-op used the vacated street on a daily basis to get feed out of the store. It used the east half of the dock at the south end of the vacated street to store supplies.

William Chapman, a former employee of Monett Farmers Exchange, told the trial court he was manager of the co-op at the time it purchased Lot 12. He worked at the Main Street Feeds location from 1966 to 1978. Based on a records search the co-op conducted, he believed it owned one-half of the vacated street area. The store used the vacated street area to unload feed onto its trucks, serve its customers and receive supplies. V.B. Hall Wholesale Co. would park its trucks on the east side of the street overnight. Mr. Chapman's employer and V.B. Hall Wholesale Co. "got along good." Warehouse personnel moved their trucks when the co-op requested.

Tim Dieckhoff worked for Double M Farmers Co-op before plaintiff purchased the mill. After plaintiff purchased Lot 12 in 1989, he became its president. While he worked for Double M Farmers Co-op, his understanding was that the east half of the vacated street area belonged to the co-op and the west half belonged to V.B. Hall Wholesale Co. Both companies used the vacated street area "jointly." The co-op also used the east part of the dock on the south end of the vacated street area. Before plaintiff purchased Lot 12, Mr. Dieckhoff looked at the assessor's records and talked to Double M Farmers Co-op directors. He understood the assessor's records to indicate the dock was being assessed to the co-op. He learned that the vacated streets had been mutually used and "had kind of been agreed upon that . . . one-half of the street went to each adjoining landowner." He "relied on" the 1905 and 1947 vacation ordinances.

After buying Lot 12, plaintiff made repairs to the building located there. While this was being done, plaintiff put a roof on the portion of the dock that was assessed to Lot 12. Despite defendants' complaints, plaintiff continued using the east half of the south dock. Plaintiff enclosed the dock and replaced a scale on the vacated street area with an above-ground scale. Plaintiff patched holes in the concrete on the vacated street area and poured new concrete.

Melvin Kennedy is secretary of plaintiff. He had been manager of Double M Farmers Co-op from 1979 until 1986 or 1987. The co-op used the vacated street to load and unload feed for customers and suppliers. As far as he knew it "was always considered a general area to be used by both businesses." His understanding was that the co-op owned the east half of the area and the warehouse owned the west half. He understood the co-op owned the east half of the dock. He was aware that the V.B. Hall Warehouse trucks parked on the east side of the vacated street at night.

The trial court found, with respect to the east 40 feet of the vacated street area:

When the east 40 feet of Market Street was vacated in 1905, there remained a portion of the public street to the west. Lot 13 did not, therefore, adjoin the vacated tract. Further, [the 1905 ordinance] clearly intends that the vacated street attach to Lot 12 to form a part of the mill site. Absent clear and unequivocal evidence to the contrary, and the Court finds that the record does not rise to that level, the east 40 feet of Main [sic?]/Euclid Street has been a part of Lot 12 since 1905. The balance of Main [sic?]/Euclid

Street is attached to Lot 13 by virtue of [the 1947 ordinance].

It entered judgment declaring that plaintiff owned fee simple absolute title to the east 40 feet of the vacated street area.

As a matter of law, the intention for the vacated part of Market Street to attach to Lot 12 when V.B. Hall and Audrey Hall conveyed the property to Katy Mills (and when subsequent conveyances of Lot 12 were made) was presumed. *Prewitt,* 432 S.W.2d at 244. The presumption could be defeated only by defendants producing clear and convincing evidence to the contrary. *Koviak v. Union Elec. Co.,* 442 S.W.2d 934, 939 (Mo. 1969). The trial court concluded that they failed to do so.

The trial court, in ascertaining whether V.B. Hall intended to retain ownership of the vacated street area, was entitled to consider how the area was used after the sale of Lot 12, as well as the evidence on which defendants relied. This court cannot substitute its judgment for the trial court's with respect to the credibility of witnesses or in assessing the weight of the evidence. *Stratton v. Stratton,* 694 S.W.2d 510, 512 (Mo.App.1985).

There was substantial evidence that the owners and occupants of Lot 12 used the east portion of the vacated street from the time V.B. Hall and Audrey Hall conveyed Lot 12 to Katy Mills until the time of trial. That evidence was consistent with the east portion of the vacated street area having been conveyed as part of Lot 12. The trial court's finding that the east 40 feet of the vacated street was part of Lot 12 and the part of the judgment declaring title to the property to be vested in plaintiff was not against the weight of the evidence. The trial court committed no error in applying or declaring the law. Point I is denied.

### The Easements

■ Points II, III and IV are directed to the trial court's declaration that plaintiff has an easement over the west 30 feet of the vacated street area. The trial court declared, in a document entitled "FINDINGS," filed September 8, 1997, "that the owner of

each lot is entitled to *an easement by necessity* over that portion of the vacated street owned by the other lot owner for purposes reasonably attendant commercial use of the property." [Emphasis added.] Its earlier "FINDINGS," filed April 29, 1996, declared "that the owner of each lot is entitled to *a prescriptive easement* over that portion of the vacated street owned by the other lot owner for purposes reasonably attendant commercial use of the property." [Emphasis added.]

The judgment that is the subject of this appeal states, "On April 29, 1996, this court made and filed its 'Findings' as to the facts of this case. Said 'Findings' are adopted hereby and incorporated herein by reference." The judgment makes no reference to the findings that were filed September 8, 1997, a copy of which is part of the record on appeal as a supplemental legal file. The dilemma is that the trial court found there was an easement by prescription. It also found there was an "easement by necessity." The finding that there was a prescriptive easement is referenced in the judgment. The finding that there was an easement by necessity is not.

■ "[T]he jurisdiction of the trial court to enter a judgment rests on a pleading which states the theory of the case sufficiently to inform the adversary and the court about the questions presented for decision." *Bryant v. Price,* 893 S.W.2d 856, 858 (Mo.App.1995). Count II of plaintiff's amended petition asked the trial court to declare it had a prescriptive easement over the property owned by defendants. Defendants' counterclaim Count I sought quiet title of the 70-foot wide strip of land between Lots 12 and 13.

■ Section 527.150[5] permits a person claiming title or an interest in real estate to bring an action to determine the respective interests of the parties. The court in which a quiet title action is brought must adjudicate the interests of all the parties. *Pitts v. Pitts,* 388 S.W.2d 337, 339 (Mo.1965); *Skalecki v. Small,* 951 S.W.2d 342, 344 (Mo.App.1997).

■ This court may not speculate, however, as to the grounds on which the trial court

5. References to statutes are to RSMo 1994.

based its ruling. A judgment based on findings that are inconsistent and ambiguous does not permit appellate review but must be reversed. *Burton v. Donahue,* 959 S.W.2d 946, 948 (Mo.App.1998).

The findings the judgment incorporates by reference state that the respective owner of Lot 12 and Lot 13 "is entitled to a prescriptive easement over that portion of the vacated street owned by the other lot owner for purposes reasonably attendant commercial use of the property." The trial court further found that "use by each party of the other's property was, in each instance, permissive and that the elements of adverse possession are not present to vest title to either an easement of fee simple title in favor of either party." The findings filed September 8, 1997, that the trial court did not incorporate by reference in its judgment state "that the owner of each lot is entitled to an easement by necessity over that portion of the vacated street owned by the other lot owner."

Easements established other than by writings or adverse possession include establishment or widening of a private road "for which there is no access, or insufficiently wide access, from such property to a public road if the private road sought to be established or widened is a way of strict necessity," § 228.342, and common law easements by implication, *see Schnider v. M.E.H. Realty Inv. Co.,* 239 Mo.App. 546, 193 S.W.2d 69, 72 (1946).

Establishment of a private road across another's property is a statutory proceeding. It is initiated by filing a petition for that purpose in the circuit court. Neither plaintiff nor defendants sought, as is permitted by § 228.342, to establish or widen a private road as a way of necessity.

Neither the judgment nor written findings by the trial court declared the existence of easements by implication. Although the word "necessity" appears in recitations of the elements necessary to create an easement by implication, this court is unable to conclude that the trial court meant easement by implication when it said easement by necessity.[6]

Defendants appear to share this court's confusion regarding a basis for the trial court's judgment. Point II in defendants' brief alleges trial court error in granting plaintiff "a prescriptive easement" over property defendants own. Point III alleges trial court error in granting plaintiff "an easement by necessity" over property owned by defendants. Point IV alleges trial court error in granting plaintiff "a common law easement by necessity" over defendants' property.

■ The trial court's findings are inconsistent and ambiguous. They fail to identify with any particularity its basis for the part of the judgment that declared the respective parties have easements over the property of the other. An appellate court cannot rule on issues formulated on inconsistent and ambiguous findings. *Burton v. Donahue, supra.*

The part of the judgment holding that the respective parties have easements over the other's property must be reversed and the case remanded. The trial court is directed to review the question of whether either party has an easement over the property of the other and to state the basis for the conclusion it reaches. It may wish to consider the following cases with respect to roadways established across private property, prescriptive easements and easements by implication. *Wolfe v. Swopes,* 955 S.W.2d 600 (Mo.App. 1997) (private roadways across property of another); *Whittom v. Alexander–Richardson Partnership,* 851 S.W.2d 504, 508 (Mo. banc 1993) (prescriptive easements); and *Schnider v. M.E.H. Realty Inv. Co.,* 193 S.W.2d at 72, quoting 17 Am.Jur. p. 948, § 34 (easements by implication).

---

6. In *Schnider v. M.E.H. Realty Inv. Co.,* 239 Mo. App..546, 193 S.W.2d 69 (1946), the court said: [T]he various elements which are essential to create an *easement by implication* upon the severance of the unity of ownership in an estate are announced as follows: "(1) A separation of the title; (2) necessity that, before the separation takes place, the use which gives rise to the easement shall have been so long continued and obvious or manifest as to show that it was meant to be permanent; and (3) necessity that the easement be essential to the beneficial enjoyment of the land granted or retained. Another essential is sometimes added to these—namely, that the servitude be continuous, as distinguished from temporary or occasional."
193 S.W.2d at 72, quoting 17 Am.Jur. p. 948, § 34.

*Remaining Points on Appeal*

Defendants present two additional issues. Point V asserts the trial court erred in enjoining defendants from restricting access to the real estate the trial court found was owned by defendants and from erecting a fence or barrier that would impede plaintiff's business use of Lot 12 (and the east 40 feet of the vacated street property).

The question presented by Point V will be affected by the decision reached on remand concerning the question of easements. It should be determined in a manner consistent with the adjudication of defendants' quiet title action. The part of the judgment that enjoins defendants from restricting plaintiff's business access to the disputed property and constructing structures in the disputed area must be reversed and remanded for further consideration and determination consistent with the trial court's adjudication of title with respect to easements in the disputed area.

Point VI contends the trial court erred in denying defendants' ejectment action. The issues defendants present will be affected by the trial court's determination on remand with respect to the easement questions presented in defendants' quiet title action. The part of the judgment that denied defendants' ejectment claim must, likewise, be reversed and remanded. The issues presented in the ejectment action should be considered by the trial court on remand in conjunction with the quiet title action regarding the question of easements.

*Determination*

The part of the judgment adjudicating ownership of fee simple title to the 70–foot vacated street area is affirmed. In all other respects the judgment is reversed and remanded for action consistent with this opinion. Whether additional evidence will be required is left to the sound discretion of the trial court.

SHRUM and BARNEY, JJ., concur.